125 S.W.3d 274 (2004)
Rebecca L. MILLER, By and Through Her Guardian, MONTICELLO BANKING COMPANY; Rachel Ann Miller, By and Through Her Guardian, Monticello Banking Company; Monticello Banking Company; and Timothy Miller, Appellants,
v.
MARYMOUNT MEDICAL CENTER, d/b/a Marymount Hospital, Appellee.
No. 2001-SC-0587-DG.
Supreme Court of Kentucky.
January 22, 2004.
*276 William R. Garmer, Savage, Garmer, Elliott & O'Brien, PLLC, Lexington, Counsel for Appellants.
B. Todd Thompson, Thompson & Miller, PLC, Louisville, Counsel for Appellee.
Paul Joseph Hershberg, Steven Michael Frederick, Christopher S. Fox, Steller & Handmaker, LLP, Louisville, Counsel for Amicus Curiae Kentucky Academy of Trial Attorneys.
Gerald R. Toner, O'Bryan, Brown & Toner, Louisville, Counsel for Amicus Curiae the Kentucky Defense Counsel.
*275 Opinion of the Court by Justice COOPER.
This is an action for damages for injuries allegedly caused by medical negligence. Rebecca C. Miller, then age 31, was admitted to Marymount Medical Center, d/b/a Marymount Hospital ("Marymount") in London, Kentucky, on October 16, 1995, by her family physician, Dr. William D. Pratt. She was admitted for the purpose of giving birth by induced labor. Attempts to induce labor on October 17th were unsuccessful. On October 18th, Mrs. Miller gave birth to a healthy baby girl, Rachel Ann Miller, by Caesarean section surgery performed by Dr. Joseph W. Stern, an obstetrician/gynecologist. Following surgery, Mrs. Miller experienced respiratory difficulties. A chest x-ray taken on the morning of October 19th revealed that she had contracted pneumonia. A blood gas test on the same morning revealed a blood oxygen concentration (PO2) of 64.4. A normal PO2 is between 80.0 and 100.0. The chest x-ray and low PO2 indicated that lung congestion caused by pneumonia was preventing sufficient oxygen from entering the blood stream for delivery to other parts of the body, including the brain.
The doctors began treating Mrs. Miller with antibiotics to combat the pneumonia and pumping increased oxygen into her lungs through nasal tubes. She was also treated for pain and stress with periodic injections of Demerol and Vistaril. She continued to complain of respiratory distress throughout the day and early evening. Dr. Pratt testified that he visited Mrs. Miller's room at 9:45 p.m. and advised her and her husband, Timothy Miller, that he was going to call a pulmonologist, Dr. Vaezy, for consultation. At 9:50 p.m., Nancy Burnett, a nurse, administered injections of Demerol and Vistaril. When Dr. Pratt returned at 10:00 p.m. to inform the Millers that Dr. Vaezy would see her that night, he found Mrs. Miller unresponsive and in respiratory arrest. Dr. Pratt immediately instituted a "Code 700" for emergency resuscitation. By 10:05 p.m., Mrs. Miller had been resuscitated, intubated, placed in an oxygen bag which pumped 100% oxygen into her lungs, and transferred to the intensive care unit. A blood gas test taken at 10:05 p.m. revealed a PO2 of 90, well within normal range. By 10:17 p.m., Mrs. Miller was breathing without assistance. However, she never regained consciousness. Subsequent chest x-rays revealed increasing lung congestion despite continued administration of antibiotics and 100% oxygen. A *277 blood gas test at 11:00 p.m. revealed a PO2 of 43. Another test at 12:45 a.m. on October 20th revealed a PO2 of 44. Mrs. Miller was transferred to Fort Sanders Hospital in Knoxville, Tennessee, where efforts to improve her condition were unsuccessful. She remains comatose at a nursing home in Annville, Kentucky.
Mrs. Miller's legal guardian brought this action for damages against Dr. Pratt, Dr. Stern, and Marymount, alleging that Mrs. Miller's present comatose state resulted from negligent medical care. Her husband, Timothy Miller, and the legal guardian of her daughter, Rachel Ann Miller, joined the action to seek damages for loss of consortium. Approximately two weeks before the scheduled trial date of March 14, 2000, Appellants settled their claims against Drs. Pratt and Stern. Their claims against Marymount then proceeded to trial. At the conclusion of a seven-day trial, a Laurel Circuit Court jury returned a verdict in favor of Marymount. Pursuant to the verdict, a judgment was entered dismissing Appellants' claims. The Court of Appeals affirmed and we granted discretionary review.
Appellants retained three medical experts to review Mrs. Miller's medical records and express their opinions in this case. Two of those experts, Dr. Michael A. Matthay, an internist and pulmonologist from San Francisco, California, and Dr. Fred J. Spielman, an anesthesiologist from Chapel Hill, North Carolina, testified for Appellants at trial. Appellants' third expert, Dr. Patricia Robertson of San Francisco, an obstetrician and gynecologist specializing in maternal-fetal medicine, was deposed for discovery purposes by Dr. Stern on December 14, 1998. Marymount was allowed to read that deposition as Dr. Robertson's testimony at trial. In addition, Marymount retained Dr. Michael G. Ehrie of Ashland, Kentucky, an internist with a subspecialty in pulmonary medicine, who also testified for Marymount at trial.
Drs. Matthay, Spielman and Ehrie agreed that Mrs. Miller developed Adult Respiratory Distress Syndrome (ARDS) during the afternoon of October 19, 1995, and that this development caused both the respiratory arrest and the brain cell death that resulted in her coma.[1] They disagreed, however, as to whether the respiratory arrest caused the brain cell damage and whether better medical care could have prevented that damage. Drs. Matthay and Spielman opined that the respiratory arrest caused the brain cell damage that resulted in Mrs. Miller's coma. They also testified that earlier intubation and application of 100% oxygen therapy could have prevented the respiratory arrest. They accused the hospital's nurses of failing to furnish the treating physicians with up-to-date information on Mrs. Miller's symptoms which would have caused the physicians to more quickly institute the aggressive treatment needed to prevent the respiratory arrest. Specifically, they criticized the staff for failing to obtain repeat blood gas tests as required by an order entered in the record by Dr. Stern. They also found negligence in Nurse Burnett's administration of the Demerol injection ten minutes before the respiratory arrest, noting that administration of Demerol accelerates the progression of ARDS.
Dr. Ehrie disagreed. He testified that Mrs. Miller could not possibly have suffered irreversible brain cell damage during the five minutes that passed between the respiratory arrest and the resuscitation, and that the 10:05 p.m. blood gas test showing a PO2 of 90 indicated that the resuscitation had been successful. It was Dr. Ehrie's opinion that the brain cell *278 damage that caused Mrs. Miller's present comatose state occurred between 11:00 p.m. and 12:45 a.m., during which time Mrs. Miller's PO2 registered 43 and 44, levels insufficient to sustain brain cell life. He also testified that pneumonia is caused by infection that causes fluids to accumulate in the lung and, thus, can be treated by antibiotics and oxygen therapy, but that ARDS is caused by blood leaking from the capillaries into the lung, a phenomenon for which no presently known treatment exists. According to Dr. Ehrie, the occurrence of ARDS cannot be predicted, prevented, or treated and is fatal in fifty to ninety percent of cases. He testified that earlier intubation and administration of 100% oxygen would have neither prevented nor impeded the progression of ARDS in Mrs. Miller's lungs, and that the Demerol and Vistaril injections did not cause or hasten the respiratory arrest.
Dr. Robertson criticized the treatment rendered by Drs. Pratt and Stern but opined that nothing the nursing staff did or failed to do was a substantial factor in causing Mrs. Miller's present condition. She agreed with Dr. Ehrie that the Demerol injection played no role in causing or hastening the respiratory arrest. She also testified that the most common cause of ARDS in pregnant women is pulmonary edema associated with pyelonephritis (kidney infection) or chorioamnionitis (uterine infection). Mrs. Miller had been treated at Marymount for pyelonephritis two months before her Caesarean section, and there was evidence that she had complained of shortness of breath for five weeks immediately preceding her October 1995 admission. After reviewing the hospital records for the October 1995 admission, Dr. Robertson opined that Mrs. Miller was suffering from chorioamnionitis on October 17, 1995, two days before the onset of ARDS.
It was the jury's prerogative to weigh the credibility of the various experts and decide whose opinions to accept and whose to reject. Thus, Appellants' claims of error relate not to the sufficiency of the evidence but to two evidentiary rulings that adversely affected the credibility of three of their witnesses and another that positively affected the credibility of one of Marymount's witnesses. They also assert that the trial court improperly instructed the jury on the issue of causation. Finding no error, we affirm.

I. EVIDENCE OF SETTLEMENT: KRE 408.
Appellants assert it was error to permit Marymount to inform the jury that Appellants had "resolved their differences" with Drs. Pratt and Stern. This issue primarily pertains to an entry in the medical records made by Dr. Stern that reads as follows:
Blood gases
CO2 treatment for hypertension
Follow with repeat gases.
When the blood gas test on the morning of October 19th revealed a PO2 of 64.4, an unacceptably low blood oxygen level, Dr. Pratt countermanded Dr. Stern's order for carbon dioxide (CO2) treatment. No additional blood gas tests were performed. Marymount asserts that a correct interpretation of Dr. Stern's order is that the blood gas tests were to be repeated after the CO2 treatment and that the cancellation of the CO2 treatment effectively cancelled the order for repeat blood gas tests. Dr. Pratt agreed that the repeat blood gas tests were to follow the CO2 treatment but declined to speculate whether Dr. Stern intended for the blood gas tests to be repeated if the CO2 treatment was cancelled. Dr. Stern's testimony was presented in the form of a discovery deposition taken prior to Appellants' settlements with *279 Drs. Pratt and Stern. The significance, if any, of the "repeat gases" order was not addressed in that deposition.
In his deposition taken on December 15, 1998, Dr. Matthay testified as follows with respect to Appellants' claims against Marymount:
Q. Do you have any criticism of the way that she was cared for at the hospital, other than the opinion you've given me about Dr. Stern?
APPELLANTS' ATTORNEY: I think, so it's clear for the record, he also said Dr. Pratt.
A. No. My major concerns were with the responsible physicians.
...
Q. I think you said you didn't have any criticism, and I just wanted to ask you again, is it fair to say you don't have any criticism of the nursing care as it relates to the injuries that Ms. Miller sustained?
A. That is correct.
On the same issue, Dr. Spielman testified at his December 4, 1999, deposition that he was critical only of Nurse Burnett for administering the injections of Demerol and Vistaril to a patient in obvious respiratory distress.
Q. Who are the physicians in this case that you're critical of?
A. Dr. Pratt and Dr. Stern.
Q. Which nurse are you critical of in this case?
A. Ms. Burnett.
Q. Anybody else?
A. Any other nurse?
Q. Yes, sir.
A. No.
...
Q. Your criticism of Nurse Burnett is that she should not have administered the Vistaril and Demerol when she did there prior to the code?
A. Correct.
Q. Do you have any other criticisms of Nurse Burnett?
A. No.
Q. How much are you...
A. Well, excuse me. Let me think about that answer a little better. Okay?
Q. Sure.
(Pause.)
A. Well, I'm just trying to find out where... looking for some nursing notes. I'm looking right here. Sorry.
(Pause.)
...
A. I'll let my answer stand.
At trial, both Dr. Matthay and Dr. Spielman criticized the nursing staff for failing to perform repeat blood gas tests pursuant to Dr. Stern's order, especially after the first test revealed an abnormally low PO2. Both experts testified that they had overlooked the fact that Dr. Stern's order stated "Blood gases" (emphasis added), not "Blood gas," indicating that more than one test was to be performed. (Marymount counters that blood contains more than one gas, hence "blood gases" refers to one test, as indicated by the first line of Dr. Stern's order.) Dr. Matthay explained that he had failed to notice this distinction when reviewing the records prior to his deposition. Dr. Spielman explained that he had "made a mistake" and that it was "an oversight on my part." Dr. Matthay also testified at trial that he now had other criticisms of the nursing staff, specifically for failing to verbally report Mrs. Miller's high temperature readings and respiratory rates directly to a physician instead of merely noting same in the nurses' notes, and for administering Demerol to a patient in obvious respiratory distress.
*280 Dr. Matthay testified at trial that he did not discover his initial oversights with respect to the negligence of the nursing staff until after Appellants' attorney advised him that Appellants had "resolved their differences" with Drs. Pratt and Stern. Likewise, Dr. Spielman testified at trial that he did not discover his oversight with respect to the "blood gases" until after learning that Appellants had settled their claims against the doctors. Dr. Spielman further admitted that it was Appellants' attorney who pointed out to him that the repeat blood gases had not been performed. Thus, Marymount was able to impeach the credibility of both Dr. Matthay and Dr. Spielman by showing that they changed their opinions with respect to the negligence of the hospital's employees only after being informed that Appellants had settled with the doctorsand that it was Appellants' attorney, not Dr. Spielman, who discovered Dr. Spielman's "oversight."
Appellants assert that the impeachment was improper, relying primarily on Orr v. Coleman, Ky., 455 S.W.2d 59, 61 (1970) ("[N]either the fact nor the amount of the settlement should be communicated to the jury that tries the issue of the nonsettling tortfeasor's liability."), and Simmons v. Small, Ky.App., 986 S.W.2d 452 (1998) (plaintiff's wife's false statement in deposition that plaintiff had not settled with second tortfeasor was a collateral fact inadmissible to impeach wife's testimony at trial).[2]
Kentucky Rule of Evidence (KRE) 408 provides:
Evidence of:
(1) Furnishing or offering or promising to furnish; or
(2) Accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is present in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
(Emphasis added.)
We note at the outset that Orr was decided long before the adoption of KRE 408, and the settlement evidence in that case was not used to impeach the credibility of a witness but to limit the amount of the verdict the jury might award against the non-settling tortfeasor. Id. at 61. Simmons merely held that a witness could not be impeached by evidence that she had previously lied about a collateral matter. Id. at 455. There was no evidence that the witness in Simmons changed her testimony about a material fact after the settlement with the second tortfeasor. Thus, whether KRE 408 allows admission of evidence of a settlement with one or more codefendants in order to impeach a witness whose testimony changed after learning of the settlement is an issue of first impression in Kentucky. However, the issue has arisen in other jurisdictions that have *281 adopted an evidence rule identical to KRE 408.
Particularly persuasive is Quirion v. Forcier, 161 Vt. 15, 632 A.2d 365 (1993), a case with facts almost identical to those in the case sub judice. Quirion was a medical negligence action brought against four doctors and a medical clinic. The plaintiff settled with three of the doctors prior to trial and proceeded to trial against the fourth doctor and the clinic. The plaintiff's medical expert testified in a pretrial discovery deposition before the settlement that the negligence of the three settling doctors was primarily responsible for the death of the plaintiff's decedent and that the fourth doctor was largely blameless. After learning of the settlement, the expert changed his analysis and testified that the nonsettling doctor's negligence was primarily responsible for the death. The trial court admitted the evidence of the settlement pursuant to Vermont's version of Rule 408.
Affirming a verdict for the defendants, the Supreme Court of Vermont held that its adoption of Rule 408 modified the prior common law rule of exclusion (compare Orr, supra). Quirion, supra, at 367-68. It also held that the evidence of the settlement tended to prove bias and prejudice on the part of the expert and provided a motive for his change of opinion. Id. at 368. Finally, it held that the admission of evidence of the settlement satisfied the Rule 403 balancing test because (1) the jury was not told the amount of the settlement; (2) the jury was instructed to consider the evidence only insofar as it pertained to the expert's credibility as a witness;[3] (3) the evidence of settlement had substantial probative value because the plaintiff's case relied almost entirely on the testimony of the expert; and (4) the jury could obviously assume that if the plaintiff made claims against the nonsettling doctor and the clinic, she also would have made claims against the settling doctors. Id. at 368-69. See also United States Aviation Underwriters, Inc. v. Olympia Wings, Inc., 896 F.2d 949, 956 (5th Cir.1990) ("We are persuaded that the district court did not abuse its discretion in admitting evidence of settlement to show the change in [the witness's] position since his deposition was taken. Fed.R.Evid. 408 permits settlement evidence for any purpose except to prove or disprove liability or the amount of the claim."); Reichenbach v. Smith, 528 F.2d 1072, 1074-75 (5th Cir.1976) (FRE 408 codified trend in case law admitting evidence of settlement for purpose of impeachment); Northington v. Sivo, 102 Wash.App. 545, 8 P.3d 1067, 1070 n. 7 (2000) ("[W]hether a witness's testimony remains consistent after settling is an important factor in determining whether settlement evidence should be admitted to show bias."); Hareng v. Blanke, 90 Wis.2d 158, 279 N.W.2d 437, 441-42 (1979) (evidence of settlement with other codefendants in medical malpractice action admissible to show prejudice of plaintiff as a witness because she had a motive to play down negligence of settling defendants and emphasize that of non-settling defendants).
Admissibility of evidence tending to prove the bias of a witness is a matter of relevancy. United States v. Abel, 469 U.S. 45, 50-52, 105 S.Ct. 465, 468-69, 83 L.Ed.2d 450 (1984). "Any proof that tends to expose a motivation to slant testimony one way or another satisfies the requirement of relevancy. The range of possibilities is unlimited...." Robert G. Lawson, *282 The Kentucky Evidence Law Handbook § 4.15, at 183 (3d ed.1993).
The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. It may be proved by the witness' own testimony upon cross-examination or by independent evidence.
Parsley v. Commonwealth, Ky., 306 S.W.2d 284, 285 (1957) (citations omitted). We conclude that the trial judge did not abuse his discretion in admitting evidence of Appellants' settlement with Drs. Pratt and Stern to impeach the credibility of Drs. Matthay and Spielman. Commonwealth v. English, Ky., 993 S.W.2d 941, 945 (1999).

II. EVIDENCE THAT EXPERT WAS RETAINED BY ADVERSE PARTY.
As noted supra, Appellants initially retained Dr. Robertson who, in her December 14, 1998, pretrial deposition, criticized the medical care rendered by Drs. Pratt and Stern but testified that she had no criticism of the medical care rendered by Marymount's staff. She also testified that Appellants had retained her to review the records and render her expert opinion. Prior to their settlements with Drs. Pratt and Stern, Appellants served notice that they would take Dr. Robertson's deposition in San Francisco for the purpose of presenting it as her testimony at trial. After the settlements, Appellants cancelled the deposition, whereupon Marymount served notice that it would take Dr. Robertson's deposition for the purpose of presenting it at trial. Ultimately, Marymount did not take Dr. Robertson's deposition but, instead, read her December 14, 1998, deposition at trial. CR 32.01(c). Appellants now assert that it was reversible error to permit Marymount to inform the jury that Appellants had initially retained Dr. Robertson.
Similar to the issue pertaining to the use of settlement evidence for impeachment purposes, evidence that Appellants initially retained Dr. Robertson was relevant to her credibility as a witness. In Tuttle v. Perry, Ky., 82 S.W.3d 920 (2002), another medical negligence case, we held that evidence that an expert witness was retained by a particular party and the amount of compensation paid to the expert for services rendered was highly relevant to the issue of the expert's credibility.
The use of highly compensated, learned professionals as expert witnesses in complex litigation has become axiomatic. Many cases become reduced to a "battle of experts" and parties who enter the fray understand from the outset that the qualifications and testimonial persuasiveness of their experts will be indicative of the outcome.
Id. at 921.
As demonstrated by the facts presented here, expert witnesses are often compensated handsomely and it is widely believed that they may be expected to express opinions that favor the party who engaged them and who pays their fees.
Id. at 923.
The jury, possessed of such information will be in the best position to determine whether and to what extent the amount of compensation may affect the testimony of the witness.
Id. at 924.
These considerations also apply to evidence that a particular expert witness was neither retained nor paid by the party offering the witness's testimony, indeed, that the witness was retained and paid by the adverse party. The cases holding this *283 type of evidence inadmissible have concluded that the prejudicial effect of the evidence substantially outweighs its probative value, KRE 403, because the jury might infer that the party who retained the witness was attempting to hide relevant evidence. See Peterson v. Willie, 81 F.3d 1033, 1037 (11th Cir.1996); Agron v. Trustees of Columbia Univ., 176 F.R.D. 445, 451 (S.D.N.Y.1997); House v. Combined Ins. Co. of Am., 168 F.R.D. 236, 248 (N.D.Iowa 1996); Rubel v. Eli Lilly & Co., 160 F.R.D. 458, 460 (S.D.N.Y.1995); Granger v. Wisner, 134 Ariz. 377, 656 P.2d 1238, 1242-43 (1982). However, we view this possibility as no more prejudicial than that permitted by Tuttle, supra, i.e., that a jury might infer that a party offering the testimony of a highly paid expert witness has employed a "hired gun" to manufacture or exaggerate evidence. The "undue prejudice" argument is especially inapposite here. If there had been no settlement with Drs. Pratt and Stern and Appellants had called Dr. Robertson as their witness, Tuttle, supra, would have permitted Marymount to elicit on cross-examination the fact that she had been retained and paid by Appellants.
We are not unmindful of the general rule that a witness's credibility may not be bolstered until it has been attacked. See generally Lawson, supra, § 4.05, at 173. However, none of the cases holding this type of evidence inadmissible have relied on that rule. In City of Baltimore v. Zell, 279 Md. 23, 367 A.2d 14 (1977), the Maryland Court of Appeals analyzed the issue as follows:
The rule that one cannot bolster the credibility of his own witness, absent an attack upon credibility by the other side, is not without exceptions. Moreover, the rule is usually applied in completely different circumstances than presented in the instant case, such as an attempt to call an additional witness to testify concerning the good character for veracity of the witness or an attempt to offer a prior consistent statement of the witness solely for the purpose of supporting his veracity. In those circumstances ... valuable trial time is taken up by the introduction of unnecessary and often cumbersome evidence, as an unimpeached "witness may be assumed to be of normal moral character for veracity." However, merely asking a witness a brief preliminary question concerning his employment in connection with the case is not subject to this same objection.
It is a routine practice in trials for an attorney to ask his witness certain preliminary questions which may not be relevant to the issues being litigated, which may go beyond mere identification and which are designed to show that the witness will be somewhat credible or not biased in favor of the side calling him. For example, the educational background or professional status or employment position of a non-expert witness may be asked, or the witness's lack of prior contact with the side who has called him may be brought out. These questions give the jury some knowledge of the individual and a more complete perspective in considering his testimony.
Id. at 17 (internal quotations and citations omitted).
In the final analysis, "[a] trial is essentially a search for the truth," Cogdell v. Brown, 220 N.J.Super. 330, 531 A.2d 1379, 1381 (Law Div.1987), and the rules of evidence "shall be construed to ... the end that the truth may be ascertained and proceedings justly determined." KRE 102. Thus, we conclude that evidence tending to prove the objectivity of an expert witness is not inadmissible per se either because of its prejudicial effect or *284 because it tends to bolster the witness's credibility. "Particularly in medical malpractice cases, the credibility of experts is a paramount issue. Whether an expert is a `hired gun' or one whose opinions have greater foundations of objectivity is an issue to be litigated by counsel and considered by the jury." Cogdell, supra, at 1382. See also Broward County v. Cento, 611 So.2d 1339 (Fla.Dist.Ct.App.1993) (finding no abuse of discretion in allowing plaintiff in personal injury action to show that medical expert was initially retained by defendant); Zell, supra (finding no error in allowing defendant in condemnation action to identify valuation expert as having been initially retained by plaintiff); Fenlon v. Thayer, 127 N.H. 702, 506 A.2d 319, 323 (1986) (holding it was error to preclude plaintiff in medical negligence action from showing that expert was initially retained as a consultant by defendant); Bd. of Educ. v. Barton, 617 P.2d 347, 350 (Utah 1980) (finding no error in allowing defendant in condemnation action to show that valuation expert was initially retained by plaintiff because the witness's "employment bore directly on the all-important issue of his objectivity or bias").
As in Tuttle, supra, we conclude that in this particular "battle of the experts," the jury was entitled to know who retained and paid each expert witness, including Dr. Robertson, so as to be able to judge each witness's overall credibility. Id. at 924. While an admonition to the jury to consider the evidence for that purpose alone would have been appropriate, no admonition was requested in this case.
As for Appellants' argument that this decision will have a "chilling effect" on the future retention of expert witnesses, we believe that CR 26.02(4)(b) provides sufficient protection for those who wish to employ experts for purposes of confidential consultation. Here, Dr. Robertson had been identified as a trial witness and her discovery deposition had been taken. At that point, CR 32.01 applied.

III. IMPEACHMENT BY CRIMINAL CONVICTION: KRE 609.
Marymount was permitted to impeach the credibility of Appellant Timothy Miller by eliciting from him that he had been convicted of a felony. Although the nature and date of the conviction were not proven at trial, the parties agree that the conviction was for attempted burglary and that it occurred in 1988, more than ten years before this trial. KRE 609(b) provides:
Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten (10) years has elapsed since the date of the conviction unless the court determines that the probative value of the conviction substantially outweighs its prejudicial effect.
Note that the KRE 609(b) balancing test is the exact inverse of the KRE 403 balancing test. Under KRE 403, relevant evidence is admissible unless its probative value is substantially outweighed by its prejudicial effect. Under KRE 609(b), the evidence is inadmissible unless its prejudicial effect is substantially outweighed by its probative value. Appellants complain that the trial judge did not articulate his reason for admitting the evidence, i.e., he did not specifically state that the prejudicial effect of Mr. Miller's prior conviction was substantially outweighed by its probative value.
Appellants filed a pretrial motion in limine to preclude admission of this evidence. No videotape or transcript of the in limine hearing is in the record. However, it appears that the trial judge was not initially informed of the date of the conviction and ruled that the fact of conviction *285 was admissible under KRE 609(a). On the morning of the first day of trial, counsel for Appellants advised the trial judge that he had learned that the date of the conviction was 1988. The judge then inquired as to the nature of the conviction (attempted burglary) and advised that he would withhold his final ruling until after hearing Mr. Miller's testimony on direct examination. Obviously, the nature of a witness's testimony substantially impacts the probative value of any impeachment evidence. If Mr. Miller testified only to largely undisputed facts, the probative value of his prior conviction for impeachment purposes would be minimal. However, if his testimony went to facts bearing directly on issues of negligence and/or causation, or facts contradicted by other evidence, the probative value of the impeachment evidence would be more substantial.
Mr. Miller testified to several disputed facts relating to Marymount's negligence and the causation of Mrs. Miller's injuries. He testified that his wife had no breathing difficulties before her October 1995 hospitalization and specifically denied telling anyone that she had breathing difficulties for five weeks before that hospitalization. Based on Dr. Robertson's testimony as to the etiology of ARDS, this disputed fact was of substantial significance to the issue of causation. This issue was hotly disputed at trial. Mr. Miller also testified that no nurses or doctors came to his wife's room during the two hours immediately preceding her respiratory arrest; yet, the hospital records and the testimony of other witnesses indicated that Dr. Pratt was in the room talking to both Mr. and Mrs. Miller fifteen minutes before the respiratory arrest and that Nurse Burnett was in the room to administer injections of Demerol and Vistaril ten minutes before the arrest. Mr. Miller also implied that he had attempted suicide several times because of his wife's comatose condition; there was other evidence that he had been under psychiatric care all of his life. He testified that he had "tried to get on with my life" and "see other women" but had been unable to maintain a relationship. He claimed that he was living with his mother and his daughter, Rachel, and denied that he was living with his girlfriend, a fact relevant to his claim for loss or consortium. Marymount produced business records of the Adanta Mental Health Center containing the following notation under the heading, "Living Arrangements": "I live with family and friends. I stay with my girlfriend, Judy." Mr. Miller denied making the latter statement.
Thus, Mr. Miller placed his credibility squarely in issue by testifying in contradiction of other witnesses and of entries in hospital and business records. Such is a factor to consider in determining the probative value of the proffered evidence. Another factor is the nature of the prior conviction. Lawson, supra, § 4.30, at 217-18 (The type of conviction being offered to impeach is insignificant to the prejudice factor because the jury is not informed of the nature of the offense, but it is significant to the probativeness factor because, e.g., "a conviction for perjury is more indicative of untruthfulness than a conviction for rape."). Likewise, a conviction of burglary is a crime of dishonesty, Commonwealth v. Richardson, Ky., 674 S.W.2d 515, 517 (1984), that would be more probative of untruthfulness than a conviction of e.g., rape. Finally, a conviction that is eleven to twelve years old is more relevant than one that is, e.g., more than twenty years old. Compare Brown v. Commonwealth, Ky., 812 S.W.2d 502, 503 (1991) (admission of twenty-two-year-old conviction held reversible error), overruled on other grounds by Stringer v. Commonwealth, Ky., 956 S.W.2d 883, 891 (1997). As for the factor of prejudice, while evidence *286 that a party is a convicted felon is always prejudicial, it obviously is not as prejudicial in a civil case as in a criminal case.
Although the trial judge should have specifically articulated his findings under the KRE 609(b) balancing test, it is apparent from (1) his inquiry into the nature of the offense and (2) his reservation of his ruling until after hearing Mr. Miller's testimony on direct examination that he was aware of the need to and, in fact, did balance the probativeness of the evidence against its prejudicial effect. Under the circumstances of this case, we are unable to conclude that the trial judge abused his discretion in allowing Marymount to impeach Mr. Miller's credibility with evidence that he had previously been convicted of a felony. Commonwealth v. English, 993 S.W.2d at 945.

IV. INSTRUCTION ON CAUSATION.
The trial court instructed the jury as to Marymount's duty, breach, and causation as follows:
INSTRUCTION NO. 1
At the time and place about which you have heard evidence, it was the duty of Marymount Hospital and its employees to exercise that degree of care and skill which is ordinarily expected of a reasonably competent hospital acting under the same or similar circumstances.
INTERROGATORY NO. 1
Do nine or more of you believe from the evidence that Marymount Hospital (a) failed to comply with this duty; and (b) that such failure, if any was a substantial factor in causing injury to Rebecca Miller?

(Emphasis added.)
The jury answered "No" to Interrogatory No. 1 which, of course, was a verdict in favor of Marymount with respect to all of Appellants' claims. Appellants claim Interrogatory No. 1 should have read:
Do nine or more of you believe from the evidence that Marymount Hospital (a) failed to comply with this duty; and (b) that such failure, if any, was a substantial factor in causing Rebecca Miller to suffer a respiratory arrest?

Appellants rely primarily on Deutsch v. Shein, Ky., 597 S.W.2d 141 (1980), in which the defendant, Dr. Shein, an internal medicine specialist, ordered that the plaintiff be x-rayed without first ascertaining whether she was pregnant. When the plaintiff discovered that she was pregnant, she consulted an obstetrician/gynecologist and a pediatrician, both of whom advised her that there was a serious risk that her fetus had been damaged by the radiation. Based on this advice, the plaintiff underwent a therapeutic abortion. She then sued Dr. Shein for negligently failing to obtain a pregnancy test before ordering the irradiation. Dr. Shein introduced evidence at trial that the amount of radiation administered to the plaintiff did not warrant a therapeutic abortion and argued that the negligent advice of the other two physicians and the plaintiff's own conscious decision to obtain the abortion were superseding intervening causes. The jury was instructed by special interrogatories, similar to the interrogatory given to the jury in this case, and returned verdicts finding that Dr. Shein was negligent in ordering the x-rays but that his negligence was not a substantial factor in causing the plaintiff's injury (presumably the abortion).
Deutsch held that, as a matter of law, a person who has been injured is entitled to follow reasonable medical advice. Id. at 145. Thus, the advice the plaintiff received regarding the effects of the radiation and the actions she took in reliance *287 thereon were not superseding causes. Id. In reaching that conclusion, Deutsch held that the substantial factor test did not apply to the ultimate injury, i.e., the abortion, but to the event that caused the injury, i.e., the irradiation, citing instructions applicable to automobile accident cases ("substantial factor in causing the accident"). Id. (citations omitted). Thus, Appellants assert that the jury instructions in the case sub judice should have focused on the "event," which they identify as the respiratory arrest, not the "injury," i.e., the coma. Of course, Appellants' proposed interrogatory would have erased Dr. Ehrie's testimony that the respiratory arrest did not cause Mrs. Miller's coma.
Interestingly, while holding that the instruction in that case should have focused on the event and not the injury, Deutsch, supra, also cited the Restatement of Torts (Second) § 431 for the definition of legal cause:
The actor's negligent conduct is a legal cause of harm to another if
(a) his conduct is a substantial factor in bringing about the harm, and
(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.
Id. at 144 (emphasis added).
We perceive no substantial distinction between "harm" and "injury." However, there is a distinction between "harm" and the "event" that caused it. Thus, we conclude that Deutsch requires the "event" instruction only when there is a claim of a superseding intervening cause and the trial court has held that the intervening event was not a superseding cause. See also NKC Hosps., Inc. v. Anthony, Ky.App., 849 S.W.2d 564, 569 (1993) ("The hospital's superseding cause argument pales when considering the statement in Deutsch that `injury need only flow from the event."'). We are reinforced in that conclusion by the fact that Reams v. Stutler, Ky., 642 S.W.2d 586 (1982), another medical negligence case without a superseding cause issue, which was decided less than two years after Deutsch, stated:
In medical malpractice cases the plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused the injury or death.

Id. at 588 (citation omitted) (emphasis added).
Whether an intervening event is a superseding cause is a legal issue, House v. Kellerman, Ky., 519 S.W.2d 380 (1974), so it is improper to instruct the jury to determine which of two possible events was the legal cause of the injury. Deutsch holds that, having decided as a matter of law that the intervening event was not a superseding cause, the judge should instruct the jury to determine whether the tortfeasor's negligence was a substantial factor in causing the event that, as a matter of law, caused the injury.
Here, there was no claim of a superseding intervening cause. The only issue as to causation was whether Mrs. Miller's present comatose state, i.e., her injury, was caused by the negligence, if any, of Marymount's employees, or whether it was caused by someone else (the negligence of Drs. Pratt and/or Stern) or something else (the natural progression of a disease that was neither preventable nor treatable). In light of Dr. Ehrie's testimony that the respiratory arrest did not cause the coma, it would have been error for the trial court to rule as a matter of law that it caused the coma, and giving Appellant's proposed instruction would have had the same effect. The trial court correctly instructed *288 the jury on the issue of causation in this case.
Accordingly, the opinion of the Court of Appeals and the judgment of the Laurel Circuit Court are affirmed.
All concur.
NOTES
[1] Dr. Robertson did not express an opinion on the issue of causation.
[2] We note in passing that there could be no valid hearsay objection to the settlement evidence in the case sub judice. A statement offered to show its effect on the person who heard it made is not hearsay because it is not offered for the truth of the assertion. See McCormick on Evidence § 249, at 589 (Cleary ed.1975).
[3] No admonition was requested in the case sub judice. KRE 105(a); Barth v. Commonwealth, Ky., 80 S.W.3d 390, 396 (2001) (admonition required only "upon request").