# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 26, 2010
NOT TO BE PUBLISHED

**Supreme Court of Kentucky**

2008-SC-000933-MR

RONNIE DRANE                                                                          APPELLANT

ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.                    HONORABLE THOMAS D. WINGATE, JUDGE
NO. 06-CR-00037

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

A Franklin County jury convicted Appellant Ronnie Drane of murder, attempted murder, and two counts of first-degree wanton endangerment. He was sentenced to life in prison and multiple terms that accumulated to thirty years to be served consecutively to the life sentence. Appellant takes issue with two evidentiary decisions made at trial and the consecutive structuring of his sentences. Finding no evidentiary errors at trial, we affirm Appellant's convictions. However, because the consecutive terms of sentencing are impermissible, we reverse Appellant's sentence.

**I. Background**

The offenses Appellant was convicted of occurred on March 7, 2003 in Frankfort, Kentucky. They were the culmination of a series of violent episodes in Gary, Indiana and Louisville, Kentucky, in which Appellant initially

assaulted and then tried to kidnap and murder Herman Buchanan. Though Appellant was not convicted of offenses for the prior episodes of violence, they must nevertheless be discussed first because they are relevant to the background and evidentiary issues of this case.

The first of these episodes occurred in October 2002 in Gary, Indiana. Herman Buchanan and a friend, Simeon Bradley, were staying at the home of Buchanan's mother, Dolores Buchanan, where she lived with her friend Larry Peaches. Herman Buchanan, Bradley, and Peaches were at the house when Appellant came by to purchase cocaine. Dolores Buchanan arrived home soon thereafter. When Appellant arrived, Bradley hid because he was wanted on federal drug charges and was thus attempting to conceal his whereabouts from people he did not know or trust. While hiding, Bradley observed Appellant shoot Herman Buchanan in the face and then shoot Peaches in the back. As Bradley fled the scene, he also heard screams from Dolores Buchanan, followed by more gunshots. Bradley learned later that Herman Buchanan had survived the incident, but that Dolores Buchanan and Larry Peaches had been killed.

By 2003, Herman Buchanan had moved from Indiana to Kentucky. One night in February, he went to a Louisville strip club, where the second incident occurred.

Appellant also found his way to Louisville that night. He met with his father, Ricky Drane, and another man from Indiana, Claude Fisher, at a local motel. According to Fisher, at that meeting they devised a plan to kill someone who witnessed the Gary, Indiana murders. Fisher was unaware at the time of that witness's name, but he has since identified him as Herman Buchanan.

2

The plan was for Fisher to help kidnap Herman from the club and drive him to a dark area down the street, where he would be killed. Fisher claimed that he reluctantly participated in the scheme because he feared for his own life if he were to refuse to cooperate.

When Herman came out of the club, Fisher and Ricky Drane approached him. Upon recognizing the two men, Herman screamed and turned to run back into the strip club. Fisher fired a shot into the ground. Ricky Drane attempted to fire at Herman, but his gun malfunctioned. Unsuccessful in their attempt to capture and kill Herman Buchanan, Appellant picked them up in his car and drove back to the hotel.

The final encounter between Appellant and Herman Buchanan occurred on March 7, 2003. Simeon Bradley was once again staying with Herman, this time at his residence in Frankfort. Herman had gone out for the night and around 2:00 a.m. called Bradley, telling him he was on his way home and asking him to open the door. When Bradley saw Herman pull up to the apartment, he went downstairs, opened the door, and found Herman talking to Appellant. Herman held his hands in front of him, saying, "You don't have to do this." Appellant was pointing a gun at Herman. When Appellant noticed Bradley, he started firing at both Bradley and Herman. Bradley "fell back" into the apartment without getting hit, but Herman was shot as he ran to the door. Based on an autopsy, Herman likely died minutes after being shot. After Bradley managed to lock the door, he heard a car pull up, a door close, and the car drive off.

The police soon arrived to investigate the crime. In response to questioning, Bradley falsified his identity (due to his outstanding charges), claiming to be "Brian Buchanan." He also claimed ignorance as to Herman's murder.

In their search of the crime scene, the police observed a bullet hole in Herman's dining room wall through to the adjacent apartment. Upon further investigation, the police discovered that the bullet travelled into the bedroom of the adjacent apartment, two feet above the bed, where two neighbors—Tamara and Landon Stivers—were asleep at the time of the shooting.

Police received help in their investigation of the crime from Herman's brother, Tyree Buchanan, who informed them about the incident in Gary, Indiana. Claude Fisher also came forward and described the event that took place by the strip club in Louisville. Finally, after eventually being arrested on federal drug charges, Bradley cooperated with police, admitting that he was present during the incident in Gary and also that he saw Appellant murder Herman Buchanan in Frankfort.

Appellant was indicted and found guilty of one count of murder, one count of attempted murder (for shooting at Bradley), and two counts of wanton endangerment (one each for endangering the two neighbors in the adjacent apartment). The jury recommended life for the murder, twenty years for the attempted murder, and five years for each of the wanton endangerments, all sentences to run consecutively, for an aggregate sentence of life plus 30 years. The court sentenced Appellant in accordance with the jury's recommendations.

Appellant appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant takes issue with both his convictions and the sentence imposed. As to the convictions, he raises three claims of error, all relating to evidence admitted at trial. He claims that the trial court (1) impermissibly constrained his cross-examinations of Fisher and Bradley by excluding the specifics of their own crimes and sentences and also Bradley's actual plea agreement; (2) erroneously admitted evidence of Appellant's prior attempt to kill Herman Buchanan in Louisville; and (3) erred in failing to issue a limiting admonition in regards to Appellant's prior bad acts. Finally, assuming his convictions are upheld, Appellant claims the court improperly sentenced him to 30 additional years to run consecutively to his life sentence.

### A. Plea Agreements

Bradley and Fisher were two of the Commonwealth's key witnesses in Appellant's prosecution. Bradley in particular was especially critical because he was the lone eyewitness to the murder. Fisher also supplied valuable evidence of guilt: a prior scheme by Appellant to kill Herman Buchanan.

Both witnesses had also been charged with crimes unrelated to this case. Appellant wanted to undermine their testimony by demonstrating that they had received plea deals to get them to cooperate in this case and were therefore biased in the prosecution's favor. The court permitted Appellant to ask the witnesses if they had received any such deals, but instructed Appellant not to ask about anything too specific. Appellant contends that his cross-

5

examination of Bradley and Fisher as to their plea agreements was impermissibly constrained in two ways.

First, Appellant argues that he should have been able to introduce Bradley's plea agreement itself into evidence, during cross-examination. Bradley's plea agreement provided, among other things, that in exchange for cooperating in any federal or state prosecutions, he would have certain charges dropped, a recommendation of minimum sentencing on other charges to which he would plead guilty, and a possible recommendation for a downward departure from the federal sentencing guidelines at the discretion of the U.S. Attorney's office.

Before cross-examining Bradley about his plea agreement, Appellant's counsel approached the bench and engaged in an important dialogue with Judge Wingate. Appellant asked to introduce the plea agreement directly into evidence. After some questioning from the judge, it became apparent that counsel's primary concern was demonstrating how good the deal was by showing that Bradley had faced up to a life sentence on the original charges but ultimately received only fourteen years (or, as questioning later showed, only seven years). Judge Wingate was reluctant to admit the actual agreement (most likely because it is long and apt to confuse the jury) and suggested that Appellant simply cross-examine Bradley about whether he had a deal to cooperate and the nature of the deal. Appellant responded that questioning alone would prove unsatisfactory because Bradley would just lie about the plea agreement. Judge Wingate replied that, in that case, Appellant would then be able to use the plea agreement to impeach Bradley and show his bias.

Judge Wingate provided an effective solution to Appellant's concerns and defense counsel was apparently content with it. Assuming Bradley was honest, Appellant would be able to elicit the same evidence through questioning Bradley about what type of deal he had received as he would by introducing the plea agreement itself—and do so without the potential confusion and extraneous information of the actual plea agreement. If, on the other hand, Bradley were to "lie" about the plea deal, Appellant would then be able to use it to undermine Bradley's veracity on the stand and to show it as a source of bias.

The cross-examination occurred as follows:

Defense: Did you receive any consideration for cooperation in this case for any case in Indiana . . . for your testimony? I'm not saying it's a great deal, I'm just saying did the U.S. Attorney's office dismiss some charges or give you a certain term of years and as a condition of that, that you'd cooperate and testify?

Bradley: What they said was they may take that into consideration in my sentencing.

Defense: What we're talking about really is that you had these federal drug counts, you were looking at ten to a possibility of life in prison in the federal system. Is that right?

Bradley: Right.

Defense: There were some charges dismissed and you received a recommendation, or at least a possible recommendation of fourteen years. Is that correct?

Bradley: I pleaded out to three of the counts I was charged with.

Defense: Part of the plea agreement was that they would consider that and do a memorandum to the court relating to your testimony and it was gonna be up to them to decide whether that was worth anything or not. Is that correct?

7

Bradley: Yes.

Defense: You ended up getting fourteen years is that correct.

Bradley: I received seven years.

Defense: Seven years. I thought I saw fourteen in another document, but that's seven when you were looking at ten to life, is that right?

Bradley: The only way I would have received ten to life is if I took the conspiracy charge.

If Appellant believed that Bradley had incorrectly described the terms of the plea agreement, he was free to then use it to show Bradley did in fact receive a favorable deal. However, it appears that Bradley reflected what was in the agreement relatively accurately. Though his answers may not have made it satisfactorily clear to the jury exactly what his plea agreement covered, any failure to clarify at that point was up to Appellant to rectify through his counsel's questions.

It was only on re-direct that Bradley made statements that were arguably inaccurate about his plea deal:

Commonwealth: You got a seven year sentence. What were you hoping to get?

Bradley: I had no clue what I would get.

Commonwealth: Did you get anything at all for any cooperation you've ever given anybody?

Bradley: In the fed system, I was facing a fourteen year max. When you accept responsibility in a federal court, you get a three point reduction. I was a first time offender so I qualified for another two point reduction because of that so that took me down five

points. In the feds, you dealing with a number chart, they've got a number chart they've got, they've got a guideline they've got to sentence you by. So wherever I was on the guideline, I got knocked down five points off of accepting responsibility and being a first time offender. They sentenced me to seven years.

Commonwealth: Based on the guideline and chart?

Bradley: Yes.

Commonwealth: So it doesn't sound like you got anything for cooperating.

Bradley: No. There was nothing in writing. I never received any downward departure or anything.

It is unclear what exactly Bradley meant by saying he did not get anything for cooperating and that there was nothing in writing. Arguably, he was referring only to benefits he might have received after the entry of his guilty plea. His answers tend to show that he understood the question about receiving any benefit to mean any such benefit after (and in addition to) what happened at the time he entered his guilty plea. Specifically, this would encompass the "memorandum" that Appellant's counsel mentioned, whereby the federal prosecutor, subsequent to the guilty plea, would ask the judge to depart downward from the federal sentencing guidelines. Yet, it appears from Bradley's other answers, that his sentence was only affected by the dismissal of several charges and his being a first-time offender, meaning that no such memorandum was filed. No one, not even Appellant's counsel, suggested that the federal prosecutor had indeed requested a departure from the federal guidelines.

9

However, it is also possible that Bradley was lying about the nature of his plea agreement and what he received for his cooperation. Additionally, his claim that there was nothing in writing could be construed as a claim that there was no written plea agreement, which would clearly have been false. If Appellant's counsel thought this was what he meant, he could have sought re-cross-examination to clarify and, if necessary, further impeach Bradley, perhaps by then going so far as to introduce the plea agreement itself. He did not attempt to do so, however, choosing instead to simply introduce it through avowal, under the assumption that he had already established an error. Thus, Appellant cannot claim error in this regard. He failed to establish whether Bradley was in fact lying about the content of his plea agreement and his consideration for cooperating because questioning ceased at that point.

Appellant also argues that the court should have allowed more specific questioning about the crimes that Bradley and Fisher had committed. Appellant wanted to draw the jury's attention to the seriousness of those crimes and their sentences. This claim overlaps substantially with that discussed above. Appellant claims that revealing their severity would highlight the witnesses' bias in cooperating with the prosecution so as to receive favorable punishments. Appellant is not entirely clear in his brief about what questions about their crimes he should have been permitted to ask, but for the purposes of this appeal, we will assume that his claim focuses on the questions asked of each witness by avowal.

Appellant's examination of Bradley through avowal consisted of five questions, aside from his introduction of the plea agreement and questions

10

about its contents, which were addressed above. To paraphrase, the five questions asked on avowal were: (1) Were you charged with conspiracy? (2) Was the conspiracy charge for transporting cocaine into the country? (3) Did you take responsibility for committing the crime? (4) What quantity of cocaine were you charged with transporting? and (5) What amount of time did you expect to receive?

Questions (1), (2), and (4) all pertain to the underlying activity for which Bradley was charged. Such specific evidence of the identity of the crime is generally inadmissible at trial if offered solely to undermine the general credibility of the witness "unless the witness has denied the existence of the conviction." KRE 609(a). The specifics of a witness's crime are not necessarily barred under KRE 609, however, if offered for some other legitimate purpose besides showing the witness's bad character. In particular, they are always admissible if relevant to show bias. *See Miller v. Marymount Med. Ctr.*, 125 S.W.3d 274, 281-82 (Ky. 2004); Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 4.10[2] at 279-80 (4th ed. 2003) ("The plea bargaining strategies of prosecutors and other characteristics of the criminal law and its processes encourage participants in crime to trade testimony for favored treatment.").

Appellant claims that revealing the specifics of Bradley's drug charges would have demonstrated his bias in favor of the prosecution. But more detail would not have been helpful, since Bradley admitted in his testimony that he originally faced a conspiracy charge. Moreover, there is no connection of these questions to bias. The only way Bradley's bias is implicated by the fact that his charges were for drugs is in how his punishment was lessened in exchange for

11

cooperating. Thus, the specifics of what Bradley actually did, or was charged with doing, are irrelevant to any potential bias. Instead, the amount of time that he faced based on his original charges compared to his eventual sentence was the relevant metric to demonstrate the benefit he received from any deal, and such testimony was introduced. The trial court was thus correct that these types of questions were improper on cross-examination.

Appellant cannot claim error with regard to questions (3) (whether Bradley took responsibility for the crime) and (5) (what amount of time he expected to receive), because Bradley actually answered them during re-direct. Bradley addressed whether he took responsibility for the crime when he stated, "For accepting responsibility, I got a three point reduction." Also on re-direct the Commonwealth essentially asked question (3), inquiring, "You got a seven year sentence. What were you hoping to get?" Bradley responded, "I had no clue what I would get." To the extent that question (5) was an attempt to ask Bradley what the maximum time he faced was, he also answered this, on cross, by admitting that he could have faced life if the conspiracy charge had stood.

Thus all five questions Appellant sought to have Bradley answer on avowal were either irrelevant or actually answered anyway. That the permissible questions were not answered in a level of detail satisfactory to Appellant is not error. Follow-up or clarifying questions could have solved any problem in this regard.

Appellant attempted to elicit similar information from Fisher by avowal. However, in Fisher's case, Appellant had no evidence—testimony or otherwise— that Fisher had any sort of plea agreement to cooperate with the prosecution.

12

In fact, his attorney did not even allege at a bench conference that he had such information. On the contrary, Fisher repeatedly denied any sort of cooperation with authorities. Without any *prima facie* showing that Fisher had a deal to · begin with, Appellant had not laid any foundation to make the specifics of the charges against Fisher relevant to show bias. Appellant's counsel's questions were, instead, a shot in the dark. At best then, the only purpose in admitting evidence of Fisher's charges would be to undermine his character through evidence of his bad acts. Again, KRE 609 prevents the specifics of a witness's crime from being admitted for this purpose.

We therefore find no error in the trial court's handling of Bradley and Fisher's plea agreements and related matters.

## B. Prior Bad Acts

Appellant next argues that his conviction should be reversed because evidence of his prior attempt to murder Herman Buchanan in Louisville the previous month was improperly included at trial. Appellant objected to this evidence at trial as he does here, claiming it is barred by KRE 404(b).

Evidence of prior bad acts, including attempted murders, is inadmissible to prove conformity with that behavior. KRE 404(b). In other words, it would be improper for the Commonwealth to have introduced Appellant's prior attempted murder in order to prove that he tends to attempt murder and thus, must have done so in this case as well. Just because the Appellant attempted murder once is no reason to think he must have done so again.

Of course, in this case, the prior bad act admitted into evidence does not solely function to illustrate a disposition to attempt murder. On the contrary,

13

the evidence of Appellant's previous attempt—one of two prior attempts—to kill the murder victim in this actual case shows drastically more than a possible violent disposition. Evidence of prior bad acts is admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). The evidence of Appellant's prior attempt is clearly relevant, among other possible reasons, to prove his intent to kill Herman Buchanan.

Appellant's intent to kill Herman Buchanan is relevant in at least two ways: as circumstantial evidence and as direct evidence. Appellant's prior attempted murder has circumstantial value in that it makes it more likely that Appellant is the person who murdered Herman Buchanan. Since Appellant apparently wanted Herman Buchanan dead in February, it makes it more likely that he is the person who killed him in March. In this way, the evidence has the same sort of relevance a threat to kill the victim would have: both reveal intent to kill the victim. Just as a prior threat would be admissible here, the prior attempted murder is as well. *See Scruggs v. Commonwealth*, 566 S.W.2d 405, 408-09 (Ky. 1978); *Rose v. Commonwealth*, 385 S.W.2d 202, 204 (Ky. 1964).

Additionally, Appellant's intent to kill Herman Buchanan has direct evidentiary value. Intent is one of the elements of murder, which Appellant was charged with and convicted of. KRS 507.020(1)(a) ("A person is guilty of murder when . . . [w]ith intent to cause the death of another person, he causes the death of such person. . . ."). Evidence of Appellant's prior attempt to kill

14

Herman Buchanan was relevant to prove that Appellant had the necessary *mens rea* to satisfy this element of the crime.

The probative value of this evidence obviously outweighs any unfair prejudice toward Appellant. The introduction of a prior bad act virtually always carries with it some unfair prejudice. *See Bell v. Commonwealth*, 875 S.W.2d 882, 890 (Ky. 1994). The question is whether the act's probative value outweighs the prejudice. *See Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992). One is hard pressed to imagine a prior bad act with more probative value than the one in question. Appellant's prior attempt involved the same crime against the same victim within one month of the crime for which he was tried. It demonstrates intent to kill Herman Buchanan and a willingness to follow through. Where there is such a "direct connection between the other crime[] and the charged crime" the evidence of the other crime surely passes this balancing test. *White v. Commonwealth*, 178 S.W.3d 470, 476-78 (Ky. 2005).

Appellant urges that even if this prior act was admissible, that both of his prior attempts to murder Herman Buchanan should have been subject to limiting admonitions to the jury that they not be used to infer mere conformity. Appellant requested an admonition but not until the discussion of jury instructions, after the close of all the evidence. The admonition was denied.

According to KRE 105(a), "When evidence which is admissible as to one (1) party or for one (1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly." However,

15

Appellant did not request the admonition at the time the evidence was presented, and therefore waived it.

This Court has previously stated that this type of jury admonition must be requested at the time the evidence is presented at trial. "[W]e interpret the first word of KRE 105(a), i.e., 'when,' to mean that the request for a 'limited purpose' admonition must be made at the time that the evidence in question is admitted and no later than after the direct examination at which the evidence is introduced." *St. Clair v. Commonwealth*, 140 S.W.3d 510, 559 (Ky. 2004). Appellant did not seek an admonition either when the evidence was introduced or at the close of the direct examinations of the pertinent witnesses. Instead, he requested the admonition during the discussion of jury instructions, after both the Commonwealth and defense had rested. Thus, "the trial court appropriately denied Appellant's belated request for an instruction." *Id.*

In his reply brief, in light of *St. Clair v. Commonwealth*, Appellant urges that the trial court should have issued an admonition *sua sponte* and that its failure to do so should therefore be reviewed for palpable error. However, "[t]he failure to give an unrequested limiting admonition is not palpable error." *Ernst v. Commonwealth*, 160 S.W.3d 744, 759 (Ky. 2005).

Here, the admission, even without admonition, of evidence of Appellant's prior attempts to murder Herman Buchanan was not error as set forth above.

### C. Consecutive Sentences

The jury recommended the maximum sentence for each of Appellant's offenses: life for murder, twenty years for attempted murder, and five years for each of two counts of wanton endangerment. The jury also recommended that

16

these terms all run consecutively. The court sentenced Appellant in accordance with the jury's recommendation, thus imposing a sentence of life plus thirty years, to run consecutively.

Appellant complains, and the Commonwealth concedes, that a term of years cannot run consecutively to a life sentence. Both sides are correct that "no sentence can be ordered to run consecutively with such a life sentence in any case." *Bedell v. Commonwealth*, 870 S.W.2d 779, 783 (Ky. 1993). "The aggregate of consecutive indeterminate terms shall not exceed in maximum length the longest extended term which would be authorized by KRS 532.080 for the highest class of crime for which any of the sentences is imposed. In no event shall the aggregate of consecutive indeterminate terms exceed seventy (70) years." KRS 532.110. Since the longest extended term ever authorized by KRS 532.080, or any other statute for that matter, is a life sentence, an aggregate sentence can never be greater than life imprisonment. As a result, the trial court should have ordered the 30 years to run concurrently with Appellant's life sentence. The trial court's order to run the sentences consecutively is, therefore, reversed.

### III. Conclusion

For the foregoing reasons, Appellant's convictions are affirmed. Appellant's consecutive sentencing is reversed. The sentencing portion of the judgment is vacated and this matter is remanded to Franklin Circuit Court for sentencing in accordance with this opinion.

All sitting. All concur.

17

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Department of Public Advocacy
100 Fair Oaks Lane
Suite 302
Frankfort, Kentucky 40601


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

David Bryan Abner
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, Kentucky 40601