Ira BRANHAM, Individually, and as Administrator of the Estate of Peggy Branham, Deceased, Appellant

v.

Troy C. ROCK, M.D.; Larry L. Britt, II, M.D.; Andrew C. Bernard, M.D.; Shane D. O'Keefe, M.D.; Calixto M. Pulmano, M.D.; Jason L. Keszler, D.O.; Murray B. Clark, Associate Vice President for Medical Center Operations; University of Kentucky Medical Center; University Hospital of the Albert B. Chandler Medical Center, Inc.; and Kentucky Medical Services Foundation, Inc., Appellees

2012–SC–000707–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 18, 2014

·COUNSEL FOR APPELLANT: Stephen M. O'Brien III, Lexington, Cory Michael Erdmann, Erdmann & Stumbo, PLLC, Richmond

COUNSEL FOR APPELLEES: Bradley A. Case, Stephen Joseph Mattingly, Dinsmore & Shohl, LLP, Louisville, William Thro, General Counsel-University of Kentucky, Lexington

OPINION OF THE COURT BY
JUSTICE KELLER

Ira Branham, individually, and as administrator of the estate of Peggy Branham (hereinafter collectively referred to as "the Estate"), appeals from the opinion of

the Court of Appeals affirming the judgment in favor of Troy Rock, M.D., Larry L. Britt, II, M.D., Calixto M. Pulmano, M.D., and Jason L. Keszler, D.O. (hereinafter collectively referred to as "the Physicians"). The Estate argues that the trial court erroneously excluded evidence, abused its discretion with regard to limiting expert witnesses, and erroneously instructed the jury. The Estate also appeals the trial court's order dismissing the Estate's claims against the University of Kentucky Medical Center (the Medical Center) and University Hospital of the Albert B. Chandler Medical Center, Inc. (the Hospital Corporation) based on a finding that those entities have immunity.[1] Having reviewed and considered the record, the briefs filed by the parties, and the parties' oral arguments, we affirm.

## I. FACTS.

The underlying facts are essentially not in dispute., Peggy Branham (Peggy) was the unrestrained passenger in a pickup truck being driven by her husband, Ira Branham (Ira). The truck left the road and struck a tree. The passenger-side airbag deployed but did not prevent Peggy from striking the windshield, which resulted in a brief period of unconsciousness. Emergency personnel were called and Peggy was transported to Mary Chiles Hospital, where she underwent a head and neck CT scan. Because of concerns about potential internal bleeding and "out of an abundance of caution," Peggy was transported by air-care to the Medical Center.

At the Medical Center, Peggy was examined and treated by Dr. Troy Rock, the attending emergency room physician, and Dr. Larry Britt, an emergency room resident. Those physicians ordered a chest x-ray, which resident Dr. Jason Keszler read as revealing "blunting to the left costophrenic angle" possibly related to "effusion or scarring" and a "3.5 cm mass-like density in the left lower lobe which is worrisome for neoplasm." Dr. Keszler recommended a chest CT scan "for further evaluation." Attending radiologist Dr. Calixto Pulmano agreed with Dr. Keszler's reading. Approximately two and a half hours after arriving in the Medical Center emergency room, Peggy was discharged with instructions to follow-up with her primary care physician.

Approximately thirty-six hours later, Peggy died at home. An autopsy revealed that she died because of a ruptured aorta related to blunt force trauma to her chest.

The Estate brought suit approximately one-year later, making direct claims of wrongful death and medical negligence against the Physicians, and vicarious liability claims against the Medical Center and the Hospital Corporation. As noted above, the trial court dismissed the Estate's claims against the Medical Center and the Hospital Corporation on sovereign immunity grounds, the jury found in favor of the Physicians, and the trial court entered a judgment consistent with the jury's findings. The Estate appeals from that judgment and the court's finding of immunity.

## II. STANDARD OF REVIEW.

Because the standards of review vary, we set forth the appropriate standard as part of our analysis of each issue.

## III. ANALYSIS.

### A. Evidence Regarding Dr. Rock's Medical License.

In 2004, Dr. Rock prescribed medications (Ambian, Hydrocodone, and Dexe-

---

1. The trial court also dismissed the Estate's claims against Kentucky Medical Services Foundation, Inc. and Murray B. Clark, Associate Vice President for Medical Center Operations. The Estate has not appealed the court's dismissal of those parties.

drine) to three people with whom he did not have a physician-patient relationship and for whom he did not have any treatment charts. The Kentucky Board of Medical Licensure (the Board) conducted an investigation which included a review by an emergency room consultant. The consultant concluded that Dr. Rock's "prescribing patterns" showed a "Gross Ignorance of the precautions and prohibitions necessary to insure the safety of patients and the community" and that his "diagnosis, treatment, records[,] and overall care were below the minimum standards of care."

Following the conclusion of the investigation, the Board and Dr. Rock entered into an agreed order whereby Dr. Rock agreed to: (1) only prescribe controlled substances to individuals with whom he had a physician-patient relationship; (2) complete the "Prescribing Controlled Drugs" course offered through Vanderbilt University Health Center within six months of the order; (3) maintain a controlled substances log; (4) permit agents of the Board to inspect, copy, and/or obtain the controlled substances log and other relevant records upon request; (5) pay the costs of the investigation; and (6) refrain from having any further violations. Nine months after entry of the agreed order, the Board fined Dr. Rock $400.00 because he had not timely completed continuing medical education requirements or sought an extension of time to do so.

During his pre-trial deposition, Dr. Rock testified that his licensure problems arose after he prescribed medication to a business partner with whom he did not have a physician-patient relationship. He also testified that he completed the terms of the agreed order. In seeking to admit Dr. Rock's deposition testimony, the Estate argued that it was untruthful and, like his licensure problems, was admissible because: it tended to show that Dr. Rock did not know the standard of care; and Dr. Rock had been identified as an expert, making evidence of his character for untruthfulness and credibility an issue.

Counsel for the Physicians filed a motion in limine seeking to exclude evidence regarding the Board's investigation of Dr. Rock, the agreed order, and Dr. Rock's deposition testimony. In support of that motion, counsel argued that such evidence would be: irrelevant because the agreed order had expired two years earlier; irrelevant because the violation had nothing to do with Dr. Rock's treatment of Peggy; inadmissible as propensity or prior bad acts evidence; and inadmissible because Dr. Rock's license had not been in any way restricted. As to Dr. Rock's deposition testimony, counsel argued that it may have been inartful or incomplete, but it was not untruthful.

Following a lengthy hearing, the trial court sustained Dr. Rock's motion. We note that, in its written order, the court did not give its reasoning for sustaining that motion. However, during the hearing, the court indicated that the evidence regarding Dr. Rock's license was collateral and inadmissible because it dealt with Dr. Rock's inappropriate prescription of medication to non-patients, not his treatment of trauma victims in the emergency room.

■ "The trial judge has wide discretion to admit or exclude evidence...." *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 680 (Ky.2005). A trial judge abuses her discretion if her "decision [is] arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky.2000).

On appeal, the Estate argues that the trial court abused its discretion when it excluded evidence regarding Dr. Rock's

licensure problems because: (1) Dr. Rock was identified as an expert witness and the disciplinary proceedings before the Board go "to his credibility and knowledge as an expert witness;" and (2) Dr. Rock's licensure problems go "to his medical knowledge and knowledge regarding the applicable standard of care."

We recently addressed when evidence of a physician's collateral misconduct is admissible in *Trover v. Estate of Burton*, 423 S.W.3d 165 (Ky.2014). In *Estate of Burton*, an oncologist alleged that Dr. Trover "had poor practice habits and was not a reliable reader of mammograms and other diagnostic radiographic images." *Id.* at 168. The Board undertook an investigation of those allegations and concluded that Dr. Trover "lacked 'consistent diligence,'" interpreted more than twice as many images as the average radiologist, and had significantly misread several images. *Id.* Although he was no longer practicing in Kentucky, Dr. Trover contested the Board's findings and presented evidence to the contrary. *Id.* Ultimately, the Board and Dr. Trover entered into an agreed order whereby Dr. Trover agreed to limit the number of images he reviewed per day and to have his work reviewed by a radiologist approved by the Board. *Id.* at 170–71.

During this time period, Dr. Trover read several CT scans of Judith Burton's lungs as showing no evidence of cancer. *Id.* at 171. Burton's estate alleged that Dr. Trover misread those CT scans, missing evidence of lung cancer from which Burton ultimately died. *Id.* Furthermore, Burton's estate alleged that, if Dr. Trover had correctly read the CT scans, Burton would have received timely treatment of her lung cancer and would not have died when she did. *Id.*

Dr. Trover moved in limine to exclude any evidence of his licensure problems with the Board. *Id.* The trial·court noted that Dr. Trover's licensure problems might have some relevance, but ruled that any probative value of that evidence would be outweighed by its prejudicial effect. *Id.* at 172. Burton's estate appealed from the jury's verdict in favor of Dr. Trover, arguing in pertinent part that the trial court abused its discretion by excluding evidence of Dr. Trover's licensure problems. *Id.* The Court of Appeals reversed on that issue holding that the evidence was directly relevant to the estate's allegations, and it should not have been excluded. *Id.*

We reversed the Court of Appeals. In doing so, we held that:

> [E]vidence of collateral misconduct to show a person's propensity to engage in such conduct . . . is admissible only if (1) it is relevant for a legitimate purpose; (2) it is probative, *i.e.,* only if there is sufficient evidence that the other crime, wrong, or act actually occurred; and (3) its probative value is not substantially outweighed by any prejudicial effect.

*Id.* With the preceding in mind, we address each of the Estate's arguments regarding Dr. Rock's licensure problems in turn.

### 1. Credibility and Knowledge as an Expert Witness.

■ The Estate argues that, because the Physicians identified Dr. Rock as an expert witness, his knowledge of the standard of care "is squarely at issue" and his licensure problems are relevant to his credibility as an expert witness. However, the Estate's initial premise is faulty. It does not matter whether the Physicians identified Dr. Rock as an expert witness. What matters is whether Dr. Rock testified as an expert witness. As noted by the Estate in its brief, Dr. Rock testified about his education and credentials; the various positions he has held in the medi-

cal field; his experience as an emergency room physician; his role as Dr. Britt's supervising physician; the signs and symptoms of an aortic injury; the course of treatment Peggy received; and why he and Dr. Britt pursued that course of treatment. He did not testify regarding the appropriate standard of care, and he did not refer to outside sources to support his treatment of Peggy. Thus, Dr. Rock testified primarily as a defendant and fact witness, not as an expert witness. *See Estate of Burton*, 423 S.W.3d at 177. Because Dr. Rock did not testify primarily as an expert witness, evidentiary decisions regarding the impeachment of expert witnesses have little application to Dr. Rock's testimony. Furthermore, because Dr. Rock did not testify about the standard of care, his knowledge about the appropriate standard of care was not at issue. As the Physicians note in their brief, the issue in a Kentucky medical malpractice case is whether a physician complied with the appropriate standard of care, not whether he knew what that standard was.

The Estate relies primarily on two cases to support its argument—*Hodes v. Ireland,* 2006–SC–000890–DG, 2009 WL 1830758 (Ky. June 25, 2009) an unpublished opinion of this Court, and *Ferris v. Tennessee Log Homes, Inc.,* CIVA4:06CV–35–M, 2010 WL 1049852 (W.D.Ky. Mar. 19, 2010), an opinion from the U.S. District Court for the Western District of Kentucky. These cases are not controlling and distinguishable.

In *Hodes,* the trial court permitted the defendant to cross-examine the plaintiff's expert witness regarding past disciplinary charges related to his license to practice medicine. *Id.* at *1. We determined that such questioning was appropriate because the witness had opened the door by testifying that he had never had any restrictions on his license. *Id.* Unlike the physi-

cian in *Hodes,* Dr. Rock was not testifying primarily as an expert but as a fact witness/defendant. Furthermore, unlike the physician in *Hodes,* Dr. Rock did not open the door by misstating facts related to the status of his license.

In *Ferris,* the defendant sought to exclude evidence that, several years prior to trial, one of its expert appraisers had entered into agreed orders and paid fines following the initiation of disciplinary proceedings by the Kentucky Real Estate Appraisers Board. *Id.* at *1. The Court denied the defendant's motion in limine finding that the evidence was relevant because the mistakes the appraiser previously made were the same types of mistakes the plaintiffs were alleging the appraiser made in evaluating the property at issue. *Id.* at *2–3. Unlike the appraiser in *Ferris,* Dr. Rock was not testifying primarily as an expert but as a fact witness/defendant. Furthermore, unlike the appraiser in *Ferris,* Dr. Rock's licensure problems were not related to the substance of his testimony—his treatment of Peggy following a motor vehicle accident—but to an unrelated issue—his inappropriate prescription of medication. Therefore, unlike the appraiser in *Ferris,* Dr. Rock's licensure problems did not directly bear on, *i.e.* were not relevant to, his testimony regarding his treatment of Peggy.

Because Dr. Rock did not express an opinion as to the appropriate standard of care and because his licensure problems were not related to his practice as an emergency room physician, evidence of those licensure problems was properly excluded by the trial court as irrelevant.

**2. Medical Knowledge and Knowledge of the Applicable Standard of Care.**

■ The Estate also argues that Dr. Rock's licensure problems were admissible to show that he lacked the necessary medi-

cal knowledge "to comprehend and [abide] by the standard of care in this case." In support of this argument the Estate cites to *Mousseau v. Schwartz*, 2008 S.D. 86, 756 N.W.2d 345 (S.D.2008). However, *Mousseau* is not persuasive for two reasons. First, the claim in *Mousseau* involved allegations that Dr. Schwartz improperly performed surgery. Dr. Schwartz's licensure problems arose because he had been the subject of multiple medical malpractice claims related to his surgeries. *Id.* at 349–50. Thus, there was a direct, and relevant, connection between Dr. Schwartz's licensure problems and Mousseau's allegations of malpractice. Here, no such connection exists because the Estate's allegations of malpractice arose from Dr. Rock's treatment of Peggy in the emergency room, *i.e.* his practice of emergency medicine, while his licensure problems did not.

Second, as noted by the Physicians, in South Dakota a physician's knowledge of the standard of care is an element to be considered in medical malpractice claims. *Id.* at 351–53. As previously stated herein, in Kentucky, it is the physician's compliance with that standard of care that is at issue. Dr. Rock's knowledge of the appropriate standard of care, which may have been of some relevance had he expressed an opinion on the issue, was not relevant to whether he complied with that standard.

Therefore, *Mousseau* is not persuasive, and we discern no abuse of discretion in the trial court's exclusion of evidence related to Dr. Rock's licensure problems.

**3. Deposition Testimony.**

█ As noted above, the Estate was not permitted to question Dr. Rock about inconsistencies between his deposition testimony and the Board's records. The Estate states that Dr. Rock's testimony

is viewed with a higher level of value and belief than that of a lay person. In this case, Dr. Rock's truthfulness is particularly important. As such, and in accordance with KRE 608, evidence that demonstrates Dr. Rock's character for untruthfulness is highly probative and [the Estate] should have been permitted to call attention to this trait through cross-examination.

As previously noted, Dr. Rock testified about the signs and symptoms of an aortic injury; the course of treatment Peggy received; and why he and Dr. Britt pursued that course of treatment. The Estate did not question whether Dr. Rock's testimony in those areas was truthful, *i.e.* it did not state that Dr. Rock's notes had been falsified or that he lied about Peggy's symptoms or his findings. What the Estate questioned was whether, in light of Peggy's presentation and his findings, Dr. Rock treated her appropriately. It was not Dr. Rock's propensity to tell the truth (while important) that was at issue but whether his actions conformed to the applicable standard of care. Therefore, evidence of Dr. Rock's alleged untruthfulness was of little relevance and likely to confuse the issues.

Furthermore, because Dr. Rock argued that his deposition testimony was not inconsistent with the Board's records, introduction of that evidence could and likely would have led to a "trial-within-the-trial" regarding the actual falsity of that testimony. Such a trial-within-the-trial could have confused the jury, caused undue delay, and unfairly prejudiced Dr. Rock. *See Trover*, 423 S.W.3d at 177. Therefore, we discern no abuse of discretion by the trial court's exclusion of this evidence.

**B. Evidence of Dr. Britt's Failure to Pass His Medical Board Examination.**

█ Dr. Britt testified during his deposition that he was required to take and

pass the "United States Medical Licensing Exam" (the licensing exam) in order to go from his second year to his third year of medical school. Dr. Britt did not pass the test on his first two attempts but did pass on his third attempt. He then successfully completed medical school at the University of Mississippi and his residency in emergency medicine at the University of Kentucky. Prior to trial, the Physicians sought to exclude any evidence regarding Dr. Britt's failure to pass the licensing exam, arguing that it was irrelevant. The court agreed with the Physicians and excluded that evidence.

The Estate argues the trial court erroneously excluded evidence regarding Dr. Britt's failure to pass the licensing exam because the Physicians identified Dr. Britt as an expert, thus putting Dr. Britt's credibility and knowledge of the standard of care at issue. As with Dr. Rock, Dr. Britt did not testify primarily as an expert but as a defendant/fact witness. Furthermore, like Dr. Rock, Dr. Britt did not give an opinion regarding the standard of care. Therefore, his knowledge of the appropriate standard of care was not at issue, and, as noted above, not relevant to whether he complied with that standard of care.

Thus, we agree with the Court of Appeals that the trial court did not abuse its discretion in excluding evidence of Dr. Britt's failed attempts to pass the licensing exam.

## C. Multiple Expert Witnesses.

■ The Estate named as defendants two emergency room physicians—one resident and one attending—and two radiologists—one resident and one attending. The Physicians identified five retained expert witnesses to testify at trial—two emergency room physicians, two radiologists, and one trauma surgeon. The Estate moved the trial court to limit the Physicians to calling only one retained expert in emergency medicine and one in radiology.[2] The court denied the Estate's motion, finding that, under these circumstances, it was not unreasonable for each defendant to identify an expert.

The Estate argues herein, as it did before the trial court, that permitting the Physicians to call two experts in radiology and two experts in emergency medicine resulted in "a needless presentation of cumulative evidence, a waste of the Court's time, and an affront to the notion of judicial economy." The Physicians argue that those four experts were necessary because the issues were complicated and the witnesses' testimony was not needlessly duplicative.

■ As the Court of Appeals noted, and as the parties agree, it is within the trial court's discretion "to control the course of litigation, including control of the amount of evidence produced on a particular point." *Washington v. Goodman,* 830 S.W.2d 398, 400 (Ky.App.1992)(citing *Woods v. Commonwealth,* 305 S.W.2d 935 (Ky.1957), and *Johnson v. May,* 307 Ky. 399, 211 S.W.2d 135 (1948)). We discern no abuse of that discretion here.

As noted above, the Estate named two emergency room physicians and two radiologists as defendants in this action. The Estate is correct that the four named physician defendants provided services in only two specialties; however, each did so from a different perspective, *i.e.* as resident physicians (Drs. Britt and Keszler) or as attending physicians (Drs. Rock and Pulmano). Therefore, it was not unreasonable for the court to permit the Physicians to identify and call expert witnesses to testify regarding the perspective of each

---

**2.** The Estate does not raise an issue regarding the trauma surgeon.

physician within their respective specialties. Furthermore, the trial court, as the Court of Appeals noted, was in the best position to determine if testimony from the Physicians' experts was needlessly cumulative and to limit that testimony accordingly.

Finally, we note that the Estate has not pointed to any specific testimony from these four expert witnesses that was unnecessarily cumulative, wasteful of the court's time, or "an affront to the notion of judicial economy." Nor has the Estate pointed to any objections it made at trial on the preceding grounds to the testimony from the Physicians' retained expert witnesses. Absent such designations, and in light of the issues involved, we cannot say that the trial court abused its discretion.

## D. Jury Instructions.

█ The jury instruction regarding the standard of care the court gave was essentially the same for each of the four physicians.

> It was the duty of the Defendant, [name of physician], in treating Peggy Branham and diagnosing her condition to exercise the degree of care and skill expected of a reasonably competent physician specializing in [emergency medicine or radiology depending on the physician] acting under similar circumstances.

The Interrogatory based on that instruction was also essentially the same for each of the four physicians.

> Do you believe from the evidence that [name of physician] failed to comply with this duty and that such failure was a substantial factor in causing Peggy Branham's death?"

The Jury answered that interrogatory in the negative for each of the four physicians.

The Estate does not contest the validity of the court's instruction regarding the standard of care; however, the Estate argues the court should have used the interrogatory it offered:

> Do you believe from the evidence that [name of physician] failed to observe this duty and that such failure was a substantial factor in the failure to diagnose Peggy Branham's aortic injury?

According to the Estate, its proffered interrogatory properly focuses on the event that caused the injury—failure to diagnose—rather than on the injury— death. In support of its argument, the Estate cites to *Deutsch v. Shein,* 597 S.W.2d 141 (Ky.1980) (abrogated on other grounds by *Osborne v. Keeney,* 399 S.W.3d 1 (Ky.2012)). In *Deutsch,* the plaintiff sought treatment from Dr. Shein for complaints of nausea, weakness, and other symptoms. *Id.* at 142. Without first testing the plaintiff to see if she was pregnant, Dr. Shein ordered a number of diagnostic x-rays and other radiologic tests. *Id.* Approximately one month later, the plaintiff discovered she was ten weeks pregnant. *Id.* The plaintiff's obstetrician/gynecologist and general practitioner advised her that there was a serious risk her fetus had been injured by the diagnostic testing ordered by Dr. Shein, and the plaintiff, based on the advice from her obstetrician/gynecologist and general practitioner, underwent a therapeutic abortion. *Id.* at 143. Following the abortion, the plaintiff alleged that she experienced mental and physical pain and suffering, which was caused by Dr. Shein's negligence. *Id.*

Dr. Shein presented evidence that the amount of radiation to which he exposed the plaintiff would not have caused any injury to her unborn child. Based on that evidence, he argued that the abortion was unnecessary, and the plaintiff's injury was

the result of the negligent advice she received from the other two physicians.

The jury determined that Dr. Shein was negligent in failing to obtain a pregnancy test before administering x-rays to the plaintiff. However, the jury found Dr. Shein's negligence was not a substantial factor in causing the plaintiff's injury. *Id.*

This Court, after undertaking a lengthy analysis of what constitutes substantial cause, reversed and remanded for a trial on damages only. In doing so this Court stated: "Our use of the substantial factor test in fashioning instructions in prior cases shows the test applied to the event which results in the injury, not the injury itself." *Id.* at 145. The Estate believes that this language mandates use of their proffered interrogatory.

The Physicians agree that the interrogatory offered by the Estate may be appropriate in certain situations. However, the Physicians do not believe that this is one of those situations and that the instruction used by the court was appropriate. We agree with the Physicians.

In *Miller ex rel. Monticello Baking Co. v. Marymount Medical Center,* 125 S.W.3d 274 (Ky.2004) we addressed when it is appropriate to use the so-called *Deutsch* instruction. Mrs. Miller gave birth via Caesarean section and then began experiencing respiratory difficulties. *Id.* at 276. Hospital personnel treated her with antibiotics and oxygen, but she went into respiratory arrest. Hospital personnel resuscitated Mrs. Miller, but she never regained consciousness, and, at the time of trial, remained comatose.

Mrs. Miller's guardian, her husband, and her daughter's guardian brought suit against the physicians and hospital. The plaintiffs settled with Mrs. Miller's physicians and proceeded to trial against the hospital. During trial, the parties presented evidence that Mrs. Miller suffered from Adult Respiratory Distress Syndrome (ARDS); however, the experts disagreed about what caused Mrs. Miller's ARDS and whether any intervention could have prevented the ultimate outcome.

The plaintiffs requested a *Deutsch* instruction stating that any failure "to exercise that degree of care and skill which is ordinarily expected of a reasonably competent hospital acting under the same or similar circumstances.... was a substantial factor in *causing Rebecca Miller to suffer respiratory arrest.*" *Miller,* 125 S.W.3d at 277. (Emphasis in original.) However, the trial court's instruction asked the jury if the hospital's breach of its duty "was a substantial factor in *causing injury to Rebecca Miller.*" *Id.* (Emphasis in original.)

In affirming the trial court we stated that "*Deutsch* requires the 'event' instruction only when there is a claim of a superseding intervening cause and the trial court has held that the intervening event was not a superseding cause." *Id.* at 287. Once a court determines whether an intervening event is a superseding cause, "the judge should instruct the jury to determine whether the tortfeasor's negligence was a substantial factor in causing the event that, as a matter of law, caused the injury." *Id.* However, when there is no claim of a superseding intervening cause, the *Deutsch* instruction is not appropriate. As we noted:

> The only issue as to causation was whether Mrs. Miller's ... comatose state, *i.e.,* her injury, was caused by the negligence, if any, of Marymount's employees, or whether it was caused by someone else (the negligence of [the physicians]) or something else (the natural progression of a disease that was neither preventable nor treatable).

*Id.*

Here, the only issue as to causation was whether Peggy's death, *i.e.* her injury, was caused by the negligent failure of her phy-

sicians to properly diagnose and treat her condition. There was no claim that an intervening superseding cause, *e.g.* allegedly faulty advice from other physicians as was the case in *Deutsch,* was a factor in causing Peggy's death.

Furthermore, Kentucky is a "bare bones" jury instruction state. *Olfice, Inc. v. Wilkey,* 173 S.W.3d 226, 229 (Ky.2005). It is the role of counsel to put flesh on those bones during closing arguments. *Id.* at 230. Counsel for the Estate did so, clearly explaining to the jury the issue to be resolved. For the preceding reasons, we hold that the trial court properly instructed the jury.

### E. Immunity.

Finally, the Estate argues that the trial court erroneously concluded that the Hospital Corporation and the Medical Center have immunity and urges us to revisit *Withers v. University of Kentucky,* 939 S.W.2d 340 (Ky.1997). In support of its position, the Estate argues that: the Hospital Corporation and Medical Center likely derive the vast majority of their operating expenses from sources other than the state treasury; the Hospital Corporation and Medical Center are separate and distinct entities from the University of Kentucky; and the educational functions performed by the Hospital Corporation and Medical Center do not differ from the educational functions performed by other hospitals. According to the Estate, the preceding factors bring into question the immunity we granted to the Medical Center in *Withers.* Furthermore, the Estate argues that, taking the preceding factors into consideration, neither the Medical Center nor the Hospital Corporation would be entitled to immunity under the test developed in *Kentucky Ctr. For the Arts Corp. v. Berns,* 801 S.W.2d 327 (Ky.1991).

In light of the ever changing landscape of the provision of medical care, with hospitals becoming more and more monolithic and monopolistic, and with funding for all medical care providers coming from both the private and public sectors, there may come a time for us to revisit *Withers.* However, as noted by the Court of Appeals, the Estate only pursued vicarious liability claims against the Medical Center and the Hospital Corporation. Because we have affirmed the trial court's judgment in favor of the Physicians, the issue of vicarious liability is moot. *Cohen v. Alliant Enterprises, Inc.,* 60 S.W.3d 536, 539 (Ky.2001) ("[I]f the agent did not act negligently, there can be no vicarious liability imputed to the principal.") Therefore, we do not address it.

### IV. CONCLUSION.

For the foregoing reasons, we affirm the trial court's judgment in favor of Drs. Rock, Britt, Pulmano, and Keszler and the trial court's summary judgment in favor of University of Kentucky Medical Center and University Hospital of the Albert B. Chandler Medical Center, Inc.

All sitting. Minton, C.J., Abramson, Cunningham, and Noble, JJ., concur. Venters, J., concurs in result only by separate opinion in which Scott, J., joins.

VENTERS, J., CONCURS IN RESULT ONLY:

I concur with the result of the Majority opinion but I disagree with its analysis. The proper jury instruction in this case is the interrogatory tendered by the Estate, requiring the jury to determine whether Dr. Rock's negligence was a substantial factor in *"the failure to diagnose Peggy Branham's aortic injury,"* rather than *"Peggy Branham's death."* Specifically, I disagree with the majority's application of *Deutsch v. Shein.*

Whether it was negligent or not, Dr. Rock's failure to discover Ms. Branham's ruptured aorta *was* the kind of interven-

ing, superseding "event" referred to in *Deutsch* and so the "event" instruction was required. Ms. Branham's death was caused by the ruptured aorta which, in turn, was caused by the vehicle accident, not Dr. Rock. But the failure to diagnose the aortic injury superseded the accident as a cause of the death, and the instruction should have addressed that contention. Instead, it permitted the jury to ignore the claim of medical negligence by answering the jury instruction with the reasonable conclusion that the death was caused by the accident and the medical negligence merely failed to prevent it.

That said, under the circumstances before us, I see no possibility that the jury failed to recognize the nature of the Estate's claim and I see no possibility that the jury was misled by the erroneous instruction actually given. Therefore, I conclude that the error was harmless, and so I concur in result.

Scott, J., joins.